In re the MARRIAGE OF Marilyn Katherine FELLERS, Respondent,

and

Eugene T. Fellers, Appellant.

No. 56589.

Missouri Court of Appeals, Eastern District, Division One.

April 10, 1990.

Application to Transfer Denied June 19, 1990.

Benson Cytron, House Springs, for appellant.

Theodore S. Schechter, Bruce E. Friedman, Marie A. Woodruff, Clayton, for respondent.

GARY M. GAERTNER, Presiding Judge.

Appellant, Eugene T. Fellers, appeals the award of maintenance, costs, and attorney's fees pendente lite (PDL) in favor of respondent, Marilyn Fellers. The Fellers were married on September 18, 1982, and separated in October of 1986. There were no children born of this marriage. The relevant facts for purposes of this appeal are as follows.

Respondent filed a petition for dissolution of marriage on November 6, 1986. On October 1, 1987, respondent filed a motion for temporary allowances with a supporting affidavit. Appellant obtained a temporary injunction on December 4, 1987, which enjoined respondent from entering the marital home during the pendency of this dissolution action. On July 11, 1988, respondent sought to modify or revoke this temporary injunction. On November 18 and 21, 1988, and on February 6, 1989, the trial court conducted a hearing on respondent's motion for temporary allowances and her motion to modify or revoke the injunction.

The evidence adduced at this hearing established that appellant was, for many years, one-half owner and president of Aero Metal Finishing, Inc. In 1983, respondent began working for this company as a secretary and she eventually became their bookkeeper. Respondent began her own limousine service sometime in June or July of 1987, while still employed by Aero. She was fired from Aero by appellant in September of 1987 for allegedly misappropriating company funds.

Since then, respondent's company, Classic Coach Limousine, has not been a profitable venture and respondent claims the company has lost a total of approximately $50,000.00. Respondent testified that she collects no income from her company and has only $140.00 in her checking account.

The evidence showed appellant to be faring much better. He sold his interest in Aero Finishing in March of 1988 and currently works as a part-time consultant for Aero. Appellant's net income for the years 1986, 1987, and 1988, was approximately $164,057.00, $135,500.00, and $1,250,000.00 respectively.[1] Appellant also had roughly $1,650,000.00 on deposit in three different banks.

The trial court awarded respondent $2,500.00 per month in temporary maintenance retroactive to October 1, 1987, $2,035.39 in costs, and $20,000.00 in attorney's fees. The court also revoked the temporary injunction and ordered that respondent be allowed to live in the marital home during the pendency of the dissolution proceeding.

■ Appellant's sole point on appeal is that the court should not have granted respondent any relief since respondent, the proponent of the PDL motions, asserted her right against self incrimination and refused to answer several questions. We agree.

Respondent was asked by appellant's counsel during her deposition several questions regarding whether she had appropriated money from Aero Finishing when she was bookkeeper. Respondent refused to answer these questions asserting her Fifth Amendment privilege. Appellant submitted a motion for sanctions and moved to strike respondent's pleadings. The trial court denied both of these motions.

During the PDL hearing, appellant introduced into evidence numerous documents (checks, bank stubs, etc.) which allegedly showed the specific instances constituting respondent's "theft" from Aero. The amount of theft represented by these doc-

---

1. The 1988 figure includes the proceeds from his sale of the company.

uments totalled $25,466.77. When respondent was asked about these items she again asserted her Fifth Amendment rights. Appellant had sought respondent's answers to questions such as whether she had altered the documents in evidence, whether she made company checks payable to her personal creditors, whether she deposited or cashed company checks, whether the documents in evidence comprised the entirety of her theft, what the total amount of her misappropriation was, and what respondent did with the money she misappropriated. At the close of respondent's case in chief, appellant moved for a directed verdict based on respondent's refusal to answer these questions which was denied by the trial court.

■ The settled rule in Missouri is that a party who asserts the Fifth Amendment privilege against self incrimination is not entitled to affirmative relief for himself or herself against other parties. *Geldback Transport, Inc. v. Delay*, 443 S.W.2d 120, 121 (Mo.1969); *Satterfield v. Satterfield*, 635 S.W.2d 80, 81 (Mo.App., E.D.1982); *Sparks v. Sparks*, 768 S.W.2d 563, 566 (Mo.App., E.D.1989). This is not to imply that a party cannot assert the privilege in a civil proceeding, however, such an assertion is not without consequences. The sound purpose behind this rule is to promote fairness and ensure that a civil plaintiff is not able to obtain relief from a party and, at the same time, conceal from him relevant evidence. *Sparks*, 768 S.W.2d at 566–567.

The modern genesis of the rule is found in *Franklin v. Franklin*, 365 Mo. 442, 283 S.W.2d 483 (1955). In *Franklin*, the plaintiff in a divorce action asserted her Fifth Amendment privilege on interrogatory questions and during a hearing on her motion for temporary allowances, refusing to answer questions regarding the status of her former marriage. *Id.* at 485. The trial court granted plaintiff ten dollars per week in temporary alimony and $150.00 in attorney's fees. *Id.* at 484. This court affirmed the award, but the Missouri Supreme Court reversed, stating that "[T]he law is that upon oral or written interrogatories being

properly propounded to discover relevant and material facts peculiarly and exclusively within the knowledge of the party, his refusal to answer justifies striking his pleadings.... This sound and salutary rule applies, insofar as we are advised, without exception to all parties seeking relief in the courts." *Id.* at 486.

However, whether it is a plaintiff or a defendant who is asserting the privilege may indeed determine how a court is required to respond. In a wrongful death action, the Missouri Supreme Court did not apply the *Franklin* rule to strike the defendant's answer where the defendant asserted his Fifth Amendment privilege. *State ex rel. Pulliam v. Swink*, 514 S.W.2d 559, 560 (Mo. banc 1974). In explaining that the rule was designed to prevent the party who asserts the privilege from gaining an unfair advantage, the court reasoned that the rule was not to be applied where the defendant asserts the privilege:

It is not unfair to preclude one who invokes the assistance of the courts from recovery when he refuses to produce evidence peculiarly within his knowledge pertinent to his right to recover. It is something else again to require one who is in court involuntarily to elect between his constitutional privilege and the automatic entry of a judgment against him. *Id.* at 561.

Most recently, this court, en banc, was faced with a petitioner in a dissolution proceeding who asserted her Fifth Amendment privilege and refused to answer interrogatory questions concerning her alleged hiring of a "hit man" to kill her husband. *Sparks*, 768 S.W.2d at 564. She also refused to answer these questions during a hearing on her PDL motion for temporary maintenance and attorney's fees. *Id.* The trial court in *Sparks* granted petitioner the relief she was seeking and on appeal she argued that the trial court had the discretion to do so, notwithstanding *Franklin*. *Id.* at 566.

This court in *Sparks*, in a well considered opinion, rejected petitioner's claim that the trial court had the discretion to grant affirmative relief. In the majority opinion,

Judge Carl Gaertner stated that "the awarding of temporary allowances to wife while she refused to answer questions relating to allegations of serious, indeed egregious, misconduct was beyond the trial court's discretion and was a misapplication of law." *Id.* at 567. This court then reiterated that the reasons for this apparently harsh rule was the "inherent inconsistency between granting a party affirmative relief while simultaneously permitting that party to conceal information which may affect his right to obtain such relief. While no comparable policy consideration applies to the invocation of the privilege by a defendant, dragged into court involuntarily, nevertheless fundamental fairness requires that a plaintiff be afforded some remedy lest a defendant defeat the claim by concealment." *Id.*

While the *Sparks* opinion also recognized that the rule did not apply to defendants, we stated that, in most cases, the defendant's use of the privilege required some form of judicial response of a remedial nature to prevent the unfairness which may result from the concealment of relevant information. *Id.* Thus, the trial court has discretion to take action to prevent unfairness which may result from a party's invocation of the privilege. This discretion does not, however, extend to the granting of affirmative relief to the concealing party while the concealment continues. *Id.*

This rule is in accord with that of other jurisdictions. In *Christenson v. Christenson*, 281 Minn. 507, 162 N.W.2d 194 (1968), the Supreme Court of Minnesota relied on our Supreme Court's *Franklin* decision in holding that a plaintiff must choose between answering questions or claiming the privilege and facing the consequent dismissal of her action. *Id.* at 203. The Supreme Court of Florida also relied on *Franklin*, in holding that "in civil litigation where it is manifest the exercise of the privilege would operate to further the action or claim of the party resorting to the privilege against his adversary contrary to equity and good conscience, the party asserting privilege will not be permitted to proceed with his claim or actions." *Stockham v. Stockham*, 168 So.2d 320, 322 (Fla.1964).

Without belaboring the point further, the rule is well established in this State and others. *See also Alvarez v. Sanchez*, 158 Cal.App.3d 709, 204 Cal.Rptr. 864 (1984); *Pulawski v. Pulawski*, 463 A.2d 151 (R.I. 1983); *Mahne v. Mahne*, 124 N.J.Super. 23, 304 A.2d 577 (1973).

Respondent does not dispute the existence of the rule but argues that it does not apply here. First, respondent asserts that denial of relief is within the trial court's discretion. As we have already stated, the trial court has no discretion to grant the proponent of an action the affirmative relief he or she seeks while the party continues to conceal relevant information. *Sparks*, 768 S.W.2d at 567. In the case at bar, respondent filed the motions for temporary allowances and to revoke the injunction. Since respondent asserted her Fifth Amendment privilege, the trial court should not have granted her affirmative relief.

Respondent also asserts that the issue of misappropriation was not relevant and that since the court had admitted appellant's evidence purporting to document the theft, the court could have considered the issue without respondent's testimony. As to this latter point, the *Sparks* case is helpful.

In *Sparks*, the respondent asserted her Fifth Amendment right and refused to answer any questions concerning her involvement in a contract to kill her husband, appellant, in a PDL dissolution hearing. *Id.* at 564. At the hearing, appellant introduced a tape recording of respondent purchasing a "hit man" to kill her husband. *Id.* Even though this tape was heard and considered by the trial judge, this court reversed the reward. *Id.* at 568. Many more questions remain unanswered here than in *Sparks*.

In *Sparks*, the basic question which petitioner refused to answer was whether she had hired a hit man to kill respondent and a tape recording of the alleged hiring was entered into evidence. *Sparks*, 768 S.W.2d at 564. Moreover, there was testimony by a police officer that petitioner had told him that she did not mean to actually hire the hit man. *Id.* In the present case, while

the appellant was able to introduce check stubs and bank statements which he claimed documented her theft, respondent did not answer whether this $25,000.00 worth of evidence was the entirety of her theft. Nor did respondent answer questions about what she did with the money and she refused to state how much money, if any, remained. .

We also note that respondent's motion sought maintenance from the date her PDL motion was filed, October 1, 1987. Therefore, it is more likely for her to have still had the use of at least some of the allegedly stolen bounty for her support. Quite simply, we feel respondent had deprived the court of the opportunity to be fully apprised of the existence and extent of her theft.

■ We recognize that respondent's refusal must be a refusal to answer questions pertinent to issues involved.[2] *Sparks*, 768 S.W.2d at 566. In this case, the question of whether respondent misappropriated company funds would be relevant to whether these funds are available to her for her support. RSMo § 452.335.1(1) (1986). Further, misconduct of either party is relevant to the court's determination of PDL support. RSMo § 452.335.2(9) (Supp.1988). The fact that the alleged misconduct occurred prior to the filing of the PDL motion did not render it irrelevant.

The trial court recognized the relevance of the issues when it overruled respondent's objection to the appellant's questions on relevance grounds. The rule, as first pronounced in *Franklin*, prevents the granting of affirmative relief to a party who asserts the privilege concerning relevant and material facts peculiarly within the knowledge of that party. *Franklin*, 283 S.W.2d at 486. The amount of money that respondent misappropriated in her favor and her disposition of it fit this definition.

Lastly, respondent asserts that the *Sparks* case should be limited to its facts—

namely, egregious, serious misconduct such as murder—and that our case "pales in comparison." If we were to limit the rule to only cover refusals to answer relevant questions concerning serious, egregious misconduct, we would be asked to continually render value judgments concerning various forms of conduct; asked to choose, for instance, between murder for hire, embezzlement, and sexual misconduct. *See Hagenbuch v. Hagenbuch*, 730 S.W.2d 269 (Mo.App., E.D.1987) (where the trial court struck the husband's pleadings in a dissolution proceeding when he refused to answer questions regarding allegedly bizarre sexual activities with his wife). We do not wish to create these types of inquiries nor do we believe that *Sparks* was intended to be so narrowly construed.

We note that *Franklin* and *Sparks* speak to a refusal by the proponent of a pleading to answer questions relevant or pertinent to their right to be granted affirmative relief. *Franklin*, 283 S.W.2d at 486. *Sparks*, 768 S.W.2d at 566. Such a refusal may, indeed, involve questions regarding criminal activity but it does not have to. Our holding in this case, therefore, is based not on the possible criminality of respondent's actions but on the fact that respondent has deprived the court of information peculiarly within her knowledge which is relevant to her right to succeed on the motions she filed with the court.

Since we find that the court did not have discretion to grant affirmative relief in favor of respondent on her motions for temporary support and revocation of the injunction, we must reverse the trial court's order. Since our reversal does not strike any of the pleadings in this case, we remand to the trial court for further proceedings not inconsistent with this opinion.

REINHARD and CRIST, JJ., concur.

---

2. We note that had the issue in this proceeding been the entitlement to child support, the questions asked and not answered may, indeed, not have been relevant to respondent's rights to support. If not relevant, then the award of affirmative relief, child support, would be proper.