**Nancy Jo DODSON, Respondent,**

v.

**Charles Keith DODSON, Appellant.**

**No. WD 49686.**

Missouri Court of Appeals,
Western District.

May 9, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 27, 1995.

Application to Transfer Denied
Sept. 19, 1995.

Roy W. Brown, Bruce B. Brown, Kearney, for appellant.

David D. Lodwick, Excelsior, for respondent.

Before BRECKENRIDGE, P.J., and ELLIS and LAURA DENVIR STITH, JJ.

LAURA DENVIR STITH, Judge.

Respondent-appellant Charles Keith Dodson appeals from a decree of dissolution of marriage from his wife Nancy Jo Dodson, alleging that the trial court erroneously considered solely the evidence that he had engaged in marital misconduct, in the form of extramarital affairs, in deciding how to divide the marital property. Mr. Dodson alleges that the evidence of extramarital affairs was insufficient to support the trial court's decision to award both a mobile home and lot and the family home to his wife Nancy.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The parties were married on May 25, 1967, and separated for the purposes of this dissolution on April 25, 1991. Mrs. Dodson filed a Petition for Dissolution on May 1, 1991, requesting a dissolution of marriage, appropriate distribution of marital property including retirement funds, maintenance and support for herself, and attorney fees and costs. Mr. Dodson answered and filed a Cross–Petition.

In the course of the dissolution proceedings, Mrs. Dodson served Interrogatories on Mr. Dodson. Mr. Dodson refused to answer Interrogatories Nos. 20, 21, 22, and 26, which requested information regarding his extramarital affairs. Instead, he invoked his constitutional right to remain silent, stating:

> I refuse to answer for the reason that I desire to take advantage of my constitutional rights under the Fifth Amendment, but not limited thereto, and I invoke all of my constitutional rights under Amendments 1 through 10 of the United States Constitution and the applicable constitutional privileges under the Constitution of the State of Missouri, Article 1, Section 19.

At the trial of the dissolution action on April 2, 1992, Mrs. Dodson presented evidence of Mr. Dodson's involvement in at least seven extramarital affairs. During these af-

fairs he would often move in with the women, leaving Mrs. Dodson to care for their child and house. Mrs. Dodson would receive harassing phone calls from certain of these women, during which the women would tell Mrs. Dodson that Mr. Dodson had spent the night with them, describing what he was wearing as proof. On one occasion, the woman Mr. Dodson was involved with became pregnant and had his child. Another time the entire family went into hiding to flee a scorned women who became upset when Mr. Dodson tried to break off the affair.

Mr. Dodson's final extramarital affair began in November of 1988. Mrs. Dodson presented evidence that Mr. Dodson provided his girlfriend with $8,525.00 to purchase a house that she lived in and that was titled in her name. Evidence was also presented that Mr. Dodson made monthly payments on the house and also spent considerable funds on items such as an air conditioner, furnace, television, etc.

In addition to the above evidence of extramarital affairs, both Mrs. Dodson and the Dodson's daughter testified about numerous episodes of physical and psychological abuse of Mrs. Dodson by Mr. Dodson. They testified that, on one occasion, he repeatedly hit Mrs. Dodson in the face. As Mrs. Dodson described the incident:

> [H]e would even stand on my feet to hold me up so that he could hit me better because he would hold me up in an upright position so the could hit me again and knock me down. He picked me up one time and threw me in the air and I landed in the back of the truck. He—he was just crazy. I don't really know what happened to him. He just went berserk.

Another time Mr. Dodson dragged Mrs. Dodson across the floor by her hair, leaving carpet burns all over her body. On yet another occasion Mr. Dodson locked Mrs. Dodson in a dog house.

Finally, Mrs. Dodson and her daughter testified that on two separate occasions, Mr. Dodson put a loaded pistol in Mrs. Dodson's mouth and threatened to kill her. One of these events took place in the presence of the Dodson's daughter.

The trial court ruled that Mr. Dodson could not testify during the trial regarding the alleged extramarital affairs because he had refused to answer the interrogatories directed toward those affairs. The parties do not contest that this ruling was within the court's discretion under the law. *See Sparks v. Sparks,* 768 S.W.2d 563, 567 (Mo.App.), *cert. denied,* 493 U.S. 957, 110 S.Ct. 372, 107 L.Ed.2d 358 (1989).

After hearing the above evidence, the trial court rendered its initial decree dissolving the marriage and dividing the marital property. In its decree the trial court further stated its belief that, because Mr. Dodson had refused to answer the interrogatories, the court was "without discretion to grant affirmative relief in favor of Respondent [Mr. Dodson], as to marital property division." The determination that marital property could not be awarded to Mr. Dodson was apparently based on the rule that "[w]here a party takes the Fifth Amendment in a dissolution action and thereby conceals pertinent information, the party is not entitled to affirmative relief when timely objection is made." *Dodson v. Dodson,* 855 S.W.2d 383, 385 (Mo. App.1993), *citing, Sparks,* 768 S.W.2d at 565.

Despite this rule, the trial court did determine to award Mr. Dodson those items of personal property which Mrs. Dodson consented to giving him. Mrs. Dodson apparently consented to the award of substantial property to Mr. Dodson, for the court awarded Mr. Dodson three pickups, a Harley Davidson motorcycle, two outboard motors, a trailer, and miscellaneous tools and equipment. No value was assigned to this personal property.

The trial court awarded Mrs. Dodson the family home valued at $75,000 to $90,000 with outstanding debts in the amount of $21,-739.33, a mobile home and lot valued at $12,-000 producing rental income of $200.00 per month, a one/fourth interest in Mr. Dodson's retirement fund which will pay at least $1,200.00 per month at age 65, and the amount of $5,862.00 (one-half of back rent collected by Mr. Dodson on the mobile home and one-half of the amount spent by Mr. Dodson on a residence lived in by Mr. Dod-

son's long-time girlfriend). Mrs. Dodson was denied maintenance and attorney's fees.

Mr. Dodson appealed, contending it was error for the trial court to hold as a matter of law that it did not have discretion to award marital property to Mr. Dodson. In *Dodson v. Dodson*, 855 S.W.2d 383 (Mo.App.1993), another division of this Court held that the trial court had erred in finding that Mr. Dodson's invocation of his right to remain silent precluded the court from awarding Mr. Dodson any property. We found that this is not the type of "affirmative relief" prohibited by the invocation of the right to remain silent. We remanded "for the trial court to exercise its discretion and divide the marital property." *Id.* at 385. This Court added that, upon remand, the trial court "has great flexibility and far reaching power in dividing marital property", and that, in fashioning its remedy:

> [T]he court is entitled to believe that the respondent's answers [to Mrs. Dodson's Interrogatories] would reflect serious and egregious misconduct that is not only immoral, but also illegal. Accordingly, the court is entitled to consider a disproportionate distribution of marital property *on the basis of the testimony presented and also on the basis of the questions asked that the respondent refused to answer.*

*Id.* (emphasis added).

On remand, the trial court issued a six page decree. The decree was very similar to the initial decree, but added the following two paragraphs:

> The Court finds the Respondent guilty of marital misconduct during the marriage. The Court finds that Respondent's answers to questions relating to marital misconduct, although refused on the basis they would tend to incriminate him, would reflect serious and egregious misconduct that is not only immoral but also illegal.

The decree then set out the marital property in detail and divided it in the same manner as it had been divided initially. As he had done in the initial decree, the trial court again denied maintenance and attorney's fees to Mrs. Dodson based on its finding that she

is capable of supporting herself through appropriate employment.

Mr. Dodson timely filed a Motion for New Trial or Request for Reconsideration. The trial court denied Mr. Dodson's motion and he timely filed this appeal.

## II. THE DIVISION OF MARITAL PROPERTY

### A. Standard of Review

In an action for dissolution of marriage, the findings and conclusions of the trial court are to be affirmed "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). In addition, when review involves the division of marital property "the trial court is vested with considerable discretion in dividing marital property and an appellate court will interfere only if the division is so heavily and unduly weighted in favor of one party as to amount to an abuse of discretion." *Dardick v. Dardick*, 670 S.W.2d 865, 869 (Mo. banc 1984).

### B. Husband's Contentions That Proper Statutory Factors Were Not Considered in Dividing Marital Property

When dividing marital property, the trial court is not required to make "an equal division of property," but must make "a fair and equitable division of the marital property in light of the circumstances attending each individual case." *Dardick*, 670 S.W.2d at 869. The factors to be considered by the trial court in dividing marital property are set forth in section 452.330.1, RSMo 1986,[1] as follows:

> [T]he court shall set apart to each spouse his nonmarital property and divide the marital property in such proportions as the court deems just after considering all relevant factors including:
>
> (1) The economic circumstances of each spouse at the time the division of property is to become effective ...;

---

1. All statutory references are to RSMo 1986 un-   less otherwise stated.

(2) The contribution of each spouse to the acquisition of the marital property, including the contribution of a spouse as a homemaker;

(3) The value of the nonmarital property set apart to each spouse;

(4) The conduct of the parties during the marriage; and

(5) Custodial arrangements for minor children.

Mr. Dodson claims that the trial court erroneously based its decision solely on a single aspect of factor (4), the "conduct of the parties during the marriage." In support, Mr. Dodson cites to the portion of the decree in which the trial court stated:

> The Court finds that Respondent's answers to questions relating to marital misconduct, although refused on the basis they would tend to incriminate him, would reflect serious and egregious misconduct that is not only immoral but also illegal.

Based on this sentence of the decree, Mr. Dodson suggests that the trial court based its award solely on the inference of marital misconduct which arose from his refusal to answer his wife's interrogatories inquiring about his extramarital affairs. Mr. Dodson suggests this is exactly what this Court held to be improper on the initial appeal of this case.

Mr. Dodson further argues that, if the relevant statutory factors noted above were properly considered, it is clear that the distribution of marital property was inequitable. He says that there was no evidence that his extramarital affairs imposed any significant financial depletion on the marital estate or other undue hardship, and that "numerous extramarital affairs, particularly in a marriage of long duration and wherein there are subsequent reconciliations, should not deprive one of any equitable distribution of the marital property." Mr. Dodson contends the remaining property was "roughly equally" divided and suggests that the two homes also be equally divided.

## C. The Trial Court Considered All Evidence of Marital Misconduct and All Relevant Statutory Factors in Dividing the Marital Property.

■ Mr. Dodson interprets the trial court's decree too narrowly. As Mr. Dodson notes, the trial court's decree did separately refer to Mr. Dodson's failure to answer the interrogatories, stating:

> The Court finds that Respondent's answers to questions relating to marital misconduct, although refused on the basis they would tend to incriminate him, would reflect serious and egregious misconduct that is not only immoral but also illegal.

However, the decree nowhere indicates that the court's division of marital property is based on this finding alone. To the contrary, the decree contains a specific additional finding that "the Respondent [was] guilty of marital misconduct during the marriage." This finding, contained in a separate paragraph from that dealing with Mr. Dodson's failure to answer interrogatories, appears to be based on the considerable affirmative evidence of marital misconduct adduced by Mrs. Dodson, without regard to the inference which arose from Mr. Dodson's failure to answer interrogatories.

It is true, as Mr. Dodson notes, that the trial court did not specifically set out in the decree the specific instances of marital misconduct which it found, but it was not required to do so. A trial court is only required to make specific fact findings in its decree if requested by the party and only "on such controverted fact issues as have been specified by counsel." Rule 73.01(a)(3); *Air Evac EMS v. Goodman*, 883 S.W.2d 71, 73 (Mo.App.1994). Mr. Dodson does not contend that he requested findings of fact under this Rule. Therefore, we will presume that the trial court's findings as to any factual issues not specifically addressed in the decree were found in accordance with the division of property reached by the trial court. Rule 73.01(a)(3).

We further find that evidence was presented at trial as to only three of the five potentially relevant statutory factors [2], and that, in

---

**2.** Factors 3 and 5 are not applicable in that there was no evidence presented as to nonmarital property and the only child had reached maturity.

light of this evidence, the trial court acted well within its discretion in dividing the marital property in the manner it did.

■ As noted above, the first statutory factor is "the economic circumstances of each spouse at the time of the division of property." There was evidence that, at the time of the division, Mrs. Dodson was capable of working and supporting herself. There was also evidence that, while Mr. Dodson had earned $36,000.00 per year during the marriage, he was on a disability leave at the time of decree. This factor might thus support a decision to award little or no maintenance to Mrs. Dodson. And, indeed, the decree states in relevant part as follows:

> The Court finds that Petitioner has sufficient property to provide for her reasonable needs and is capable of supporting herself through appropriate employment. Therefore, maintenance is denied to Petitioner and is deemed non-modifiable.

The trial court similarly refused to award Mrs. Dodson attorney's fees. For the same reason, it can be inferred that this factor played a role in the court's decision to award Mrs. Dodson only a one/fourth interest in Mr. Dodson's retirement fund. *See* Rule 73.01(a)(3).[3]

Consideration of the second statutory factor, the contribution of the parties to the acquisition of the marital property, including Mrs. Dodson's contribution as homemaker, also supports the trial court's decree. The evidence showed that Mrs. Dodson worked during the marriage and often was primarily responsible for supporting the family. There was evidence that while Mr. Dodson earned $3,000.00 per month during some of their marriage, none of this was given to Mrs. Dodson. Mrs. Dodson also cared for the family while Mr. Dodson was away on trips or living with the women with whom he engaged in extramarital affairs. Mrs. Dodson assumed primary responsibility for building the family home. There was evidence that Mr. Dodson was away on trips for 97 of the 130 days that it took to build the home.

Finally, there can be no question that the record was replete with evidence as to the fourth statutory factor, the conduct of the parties during the marriage. *Gustin v. Gustin*, 861 S.W.2d 639 (Mo.App.1993), explained the important role marital misconduct plays in the division of property. While noting that "there should not be an inordinate focus upon a particular incident or even a series of incidents, particularly in a marriage of long duration," the court stated:

> We believe the conduct factor becomes important when the conduct of one party to the marriage is such that it throws upon the other party marital burdens beyond the norms to be expected in the marital relationship.

*Id., quoting, Burtscher v. Burtscher*, 563 S.W.2d 526, 527–28 (Mo.App.1978). *Gustin* went on to state that:

> [I]t is misconduct which upsets the balance in a marriage which requires that each spouse contribute equally. It is only when misconduct of one spouse changes the balance so that the other must assume a greater share of the partnership load that it is appropriate that such misconduct can affect the distribution of property.

*Id.*

There was substantial evidence that the conduct of Mr. Dodson placed marital burdens on Mrs. Dodson beyond the norms to be expected in the marital relationship. Mrs. Dodson presented evidence of Mr. Dodson's involvement in at least seven extramarital affairs. One of Mr. Dodson's infidelities resulted in the birth of a child and, on one occasion, the entire family went into hiding to flee a scorned women who became upset when Mr. Dodson tried to break off the affair. Mr. Dodson's final extramarital affair began in November of 1988. Evidence was presented that Mr. Dodson made the down payment and monthly payments on the house that his lover was living in, and also spent considerable funds on items such as an air conditioner, furnace, television, etc.

---

**3.** It should also be noted that the trial court did not "roughly equally" divide the remaining marital property in that it only awarded Mrs. Dodson a one/fourth interest in the retirement fund, an important source of future income.

Both Mrs. Dodson and her daughter also testified about numerous episodes when Mr. Dodson would abuse Mrs. Dodson, including one occasion when he dragged Mrs. Dodson across the floor by her hair; two instances in which he put a loaded pistol in her mouth and threatened to kill her (once in the presence of the child); and one instance in which he locked Mrs. Dodson in a dog house.

Based upon this evidence and the relevant statutory factors, this Court determines that the trial court could in its discretion consider marital misconduct a very important factor in dividing the marital property. While the equities of each case must be weighed individually, the Missouri courts have upheld similar distributions of marital property considering, among other factors, the marital misconduct of one of the parties. *See, e.g., Fuqua v. Fuqua*, 765 S.W.2d 640 (Mo.App. 1989) (upholding 76% distribution to the wife based on husband's alleged misconduct including at least one incident of adultery and several instances of physical abuse); *Gray v. Gray*, 654 S.W.2d 309 (Mo.App.1983) (upholding 74% distribution to wife based on marital misconduct); *D.L.L. v. M.O.L.*, 574 S.W.2d 481 (Mo.App.1978) (upholding 67% distribution to wife based on husband's misconduct of drinking and infidelity which had "placed an unfair share of the marital load on the wife and, when equated with the prevailing concept of marriage as a partnership, entitled the wife to a greater share of the partnership assets, i.e., the marital property.").

The cases which Mr. Dodson cites in support of his contention that his marital misconduct should not deprive him of a larger distribution of property are distinguishable. Mr. Dodson cites to *Binkley v. Binkley*, 725 S.W.2d 910 (Mo.App.1987), in which the court reversed the division of marital property on the grounds that the trial court had not fully considered the statutory mandate of section 452.330. The court based its holding on the trial court's failure to mention factors other than conduct in its decree, on the trial court's verbatim adoption of the wife's decree, and because of earlier comments by the trial court that it would divide the property in half "unless somebody has been guilty of some substantial fault," thereby indicating that the

trial court would disregard the other statutorily mandated factors. *Id.* at 911–12. By contrast, the court in this case did consider all relevant statutory factors and evidence in dividing the marital property, and there is no indication in the record that it adopted Mrs. Dodson's proposed order.

The other cases cited by Mr. Dodson are also distinguishable because they involved limited instances of marital misconduct, as compared to this case which involved numerous extramarital affairs and physical abuse. *See Gustin v. Gustin*, 861 S.W.2d 639 (Mo. App.1993) (one limited instance in which the wife chopped through a door to the family home after she returned home to find the house locked and the husband's girlfriend's car in the driveway); *Kuester v. Kuester*, 633 S.W.2d 281 (Mo.App.1982) (*upholding* an equal distribution of marital property where the marital misconduct occurred after the wife developed mental problems, ceased showing affection, and moved out of the bedroom); *Burtscher v. Burtscher*, 563 S.W.2d 526 (Mo.App.1978) (one extramarital affair near or after the time the parties separated at the end of a 24 year marriage).

Mr. Dodson suggests that he too engaged in only minor marital misconduct, stating that "excluding the Platt affair, [the misconduct] is basically limited to several extramarital affairs with a presumption of a birth of a child and perhaps some terminated pregnancies and that the trial court has inordinately focused on this misconduct." We disagree that this misconduct can be considered minor or that there is any indication that it was given inordinate weight below. We further note that Mr. Dodson's summary of the evidence conveniently overlooks the instances noted above when the family had to hide from Mr. Dodson's rejected paramour, as well as the evidence that at times Mr. Dodson would leave his family to fend for themselves while he pursued his affairs.

Mr. Dodson also fails to mention the spousal abuse discussed above. Counsel for defendant suggests on appeal that we should give little weight to this evidence of abuse, and actually goes so far as to state in his reply brief that:

As to the allegations of "numerous occasions" of abuse, there appears to be little objective evidence to support her allegations, only twice seeking medical attention from her doctor.

We suggest to counsel that two occasions of seeking medical attention from one's doctor are two occasions too many, that the abuse in this case is exceedingly egregious, and that it would have supported a far less generous award of property to Mr. Dodson than he received.

We nonetheless find that the trial court acted within its discretion in making the award of numerous items of personal property to Mr. Dodson, in awarding the real property and other substantial personal property to Mrs. Dodson, and in reaching the other determinations in its decree. For these reasons, the judgment is affirmed.

All concur.